FILED
8/3/2022 3:48 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Danitra Brown DEPUTY

DC-22-09128

No. _____

| | | |
|---|---|---|
| CITY OF DALLAS; | § | |
| CITY OF ABILENE; | § | |
| CITY OF ALLEN; | § | |
| CITY OF AMARILLO; | § | |
| CITY OF ARLINGTON; | § | |
| CITY OF AUSTIN; | § | |
| CITY OF BEAUMONT; | § | |
| CITY OF CARROLLTON; | § | |
| CITY OF DENTON; | § | |
| CITY OF FORT WORTH; | § | |
| CITY OF FRISCO; | § | |
| CITY OF GARLAND; | § | |
| CITY OF GRAND PRAIRIE; | § | In the District Court of |
| CITY OF HOUSTON; | § | |
| CITY OF IRVING; | § | |
| CITY OF LEWISVILLE; | § | |
| CITY OF McKINNEY; | § | Dallas County, Texas |
| CITY OF MESQUITE; | § | |
| CITY OF NACOGDOCHES; | § | 14th |
| CITY OF PEARLAND; | § | |
| CITY OF PLANO; | § | |
| CITY OF ROWLETT; | § | |
| CITY OF SUGAR LAND; | § | _____ Judicial District |
| CITY OF TYLER; and | § | |
| CITY OF WACO, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| DISNEY DTC, LLC; | § | |
| HULU, LLC; and | § | |
| NETFLIX, INC., | § | |
| | § | |
| *Defendants.* | § | |

---

## PLAINTIFFS' ORIGINAL PETITION

---

COME NOW the Plaintiffs, by and through their attorneys of record, and file this Original

Petition against the Defendants and allege as follows:

## DISCOVERY CONTROL PLAN

1.      Discovery will be conducted under Level 3 of Texas Rule of Civil Procedure 190.4.

## INTRODUCTION

2.      Under Chapter 66 of the Texas Public Utility Regulatory Act (hereafter "PURA"), Tex. Util. Code § 66.001 *et seq.*, a Texas municipality can collect a franchise fee from a provider of video service if its programming is delivered over wireline facilities located even partly in the public right-of-way. *See* Tex. Util. Code §§ 66.005 & 66.002(10)–(11) (hereafter "franchise fee(s)"). For many years, providers of cable service, such as cable companies, which are also subject to Chapter 66, have remitted fees to Texas cities under PURA.

3.      But in recent years, more Texans have shifted to subscription-based, streaming video services like Disney DTC LLC, Hulu, LLC, and Netflix, Inc. (collectively "Defendants") to view television programs and movies. Despite transmitting their video programming through wireline facilities located at least in part in the public right-of-way, Defendants have ignored their statutory obligations to obtain a state-issued certificate of franchise authority and pay the required franchise fees, depriving Texas municipalities of the required compensation for their use of the right-of-way.

4.      PURA applies to Defendants, just as it applies to other companies furnishing video service. Defendants provide streaming "video service" to their subscribers using internet protocol technology, which is specifically referenced in PURA. Tex. Util. Code § 66.002(10) (defining "video service" as "video programming services provided through wireline facilities located at least in part in the public right-of-way without regard to delivery technology, including Internet protocol technology"). When doing so, Defendants' programming is transmitted through wireline facilities located at least in part in the public rights-of-way of the Plaintiff cities in which they operate. Therefore, Defendants are "video service providers" within the meaning of PURA and owe the Plaintiff cities franchise fees. Tex. Util. Code § 66.002(11) (defining "video service provider" as "a video programming distributor that distributes video programming services

through wireline facilities located at least in part in the public right-of-way without regard to delivery technology"). Defendants, however, have not paid such franchise fees.

5.     Plaintiffs seek to require Defendants to abide by PURA and to pay the franchise fees owed to Plaintiffs.

## PARTIES

6.     The City of Dallas is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

7.     The City of Abilene is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

8.     The City of Allen is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

9.     The City of Amarillo is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

10.     The City of Arlington is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

11.     The City of Austin is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

12.     The City of Beaumont is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

13.     The City of Carrollton is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

14.     The City of Denton is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

15.     The City of Fort Worth is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

16.     The City of Frisco is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

17.     The City of Garland is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

18.     The City of Grand Prairie is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

19.     The City of Houston is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

20.     The City of Irving is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

21.     The City of Lewisville is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

22.     The City of McKinney is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

23.     The City of Mesquite is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

24.     The City of Nacogdoches is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

25.     The City of Pearland is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since the provision of video service began.

26.     The City of Plano is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since the provision of video service began.

27.     The City of Rowlett is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

28.     The City of Sugar Land is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and

all other applicable laws, and it has been always since Defendants' provision of video service began.

29.     The City of Tyler is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since the provision of video service began

30.     The City of Waco is a lawfully existing home-rule Texas municipal corporation within the meaning of Texas Const. art. 11, Tex. Loc. Gov't Code § 9.001 et seq., and all other applicable laws, and it has been always since Defendants' provision of video service began.

31.     Pursuant to Texas Utilities Code § 66.005, Defendants are obligated to pay, and Plaintiffs are authorized to collect, franchise fees from certain companies who transmit video programming and other video programming services through the public right-of-way.

32.     Joinder of Plaintiffs in one action is permitted under Texas Rule of Civil Procedure 40 and the Texas Civil Practice & Remedies Code.

33.     Defendant Disney DTC LLC ("Disney") is a Delaware limited liability company, with headquarters in the State of California. The company's primary business is its video service, which offers online streaming of a library of films and television programs, as well as the distribution and production of original films and television series. Despite not registering to do business in Texas, Disney indeed does business in Texas, including in the Plaintiffs' jurisdictions, and has always done so since at least November 12, 2019.

34.     Defendant Hulu, LLC ("Hulu") is a Delaware limited liability company, with its headquarters in the State of California. The company's primary businesses are its video service, which offers online streaming of live video programming and a library of films and television programs, as well as the distribution and production of original films and television series. On March 18, 2010, Hulu registered itself to do business in Texas as a foreign limited liability company. Hulu does business in Texas, including in the Plaintiffs' jurisdictions, and has always done so since Hulu's provision of video service began.

35.     Defendant Netflix, Inc. ("Netflix") is a Delaware corporation with its headquarters in the State of California. The company's primary businesses are its video service, which offers online streaming of a library of films and television programs, as well as the distribution and production of original films and television series. On February 1, 2002, Netflix acquired a certificate of authority to transact business in Texas. Netflix does business in Texas, including in the Plaintiffs' jurisdictions, and has always done so since Netflix's provision of video service began.

## JURISDICTION AND VENUE

36.     The Court has subject-matter jurisdiction under the Texas Constitution, Article V, sections 1 & 8, as the amount in controversy exceeds the minimum jurisdictional limits of the court exclusive of interest, and section 24.007 of the Texas Government Code, sections 37.001–37.011 of the Texas Civil Practice & Remedies Code (Uniform Declaratory Judgments Act), and sections 65.001, 65.011, and 65.021 of the Texas Civil Practice & Remedies Code (Injunctions), and jurisdiction to enforce Defendants' obligation to pay franchise fees under PURA. Plaintiffs seek relief that can be granted by courts of law or equity.

37.     Plaintiffs have a right of action to enforce PURA. *See* Tex. Util. Code §§ 66.005(b), 66.015(a)–(b), 66.016(a)–(b).

38.     This Court possesses personal jurisdiction under section 17.042 of the Texas Civil Practice & Remedies Code (Texas's long-arm statute) because the cause of action arises from Defendants' transactions of business within Texas.

39.     Venue is proper under Chapter 15 of the Texas Civil Practice & Remedies Code, the Texas Rules of Civil Procedure, and other applicable Texas law because, *inter alia*, one or more Plaintiffs are within Dallas County, Dallas County is one of several counties in which the complained-of actions occurred, and Defendants can be found and/or do business in this County.

## FACTUAL BACKGROUND

40.    PURA allows Texas municipalities to collect franchise fees from "video service providers" who sell "video service" in their jurisdictions. Tex. Util. Code § 66.005.

41.    PURA defines a "video service provider" as "a video programming distributor that distributes video programming services through wireline facilities located at least in part in the public right-of-way without regard to delivery technology. This term does not include a cable service provider." Tex. Util. Code § 66.002(11).

42.    PURA defines "video service" as "video programming services provided through wireline facilities located at least in part in the public right-of-way without regard to delivery technology, including Internet protocol technology. This definition does not include any video service provided by a commercial mobile service provider as defined in 47 U.S.C. Section 332(d)." Tex. Util. Code § 66.002(10).

43.    PURA defines "video programming" as "programming provided by, or generally considered comparable to, programming provided by, a television broadcast station, as set forth in 47 U.S.C. Section 522(20)." Tex. Util. Code § 66.002(9).

44.    The Federal Communications Commission ("FCC") has interpreted 47 U.S.C. § 522(20) to mean "programming comparable to that provided by broadcast television stations in 1984," including superstations, cable networks, and pay cable whether on a per channel or per program basis. *Telephone Company-Cable Television Cross-Ownership Rules*, Second Report and Order, 7 FCC Rcd. 5781, 5820–21 ¶ 74 (1992). The FCC added that a service will fit that definition "to the extent a service contains severable video images capable of being provided as independent video programs comparable to those provided by broadcast stations in 1984." *Id.* Notably, the definition of "video programming" is not limited to provider-driven, channel-based broadcasting. Rather, it has for decades encompassed consumer-driven, program-based video programming.

45.    Traditional television broadcast stations that existed in the 1980s include ABC, CBS, NBC, and FOX.

46.     The FCC has confirmed that "the mere inclusion of some interactive capability [*e.g.*, replay or fast-forward] should not be sufficient to transform video programming into non-video programming" and reaffirmed its earlier conclusion that "video-on-demand images" that involve "subscriber control" still constitute "video programming." *Telephone Company-Cable Television Cross-Ownership Rules*, Memorandum Opinion and Order, 10 FCC Rcd. 244 ¶¶ 103–111 (1994). The FCC has also "held that video distributed over the Internet qualifies as 'video programming.'" *Notice of Proposed Rulemaking* in MB Docket No. 14-261, *I/M/O Promoting Innovation & Competition in the Provision of Multichannel Video Programming Distrib. Servs.*, 29 FCC Rcd. 15995, 16002, ¶ 16 & n.35 (2014) (citing 2010 decision overturning contrary 2002 decision).

I.      **Disney, Hulu, and Netflix Distribute "Video Programming Services" to Subscribers in Texas**

47.     Streaming video has been in existence since at least the 1990s.

48.     Hulu started its beta streaming video in 2007 and began streaming video to the public in early 2008.

49.     Hulu provides streaming on-demand video content, as well as live programming.

50.     Hulu's service includes several tiers, all of which include on-demand television shows and movies. Certain tiers include live television shows and movies while other tiers include no commercial videos on-demand.

51.     Since 2007, Netflix has offered online, on-demand streaming of television shows, movies, documentaries, and other content to subscribers.

52.     Netflix began offering the streaming service as a standalone service in the United States in November 2010 and has continued to do so without interruption through the present.

53.     Defendants' programming is comparable to programming provided by a television broadcast station and other providers of video programming that pay franchise fees under PURA. Defendants have not been subtle about their intentions to provide just that.

54.     Netflix states that it offers video programming "comparable to similarly-focused US domestic cable networks." *See* Exhibit A, April 16, 2018, Shareholder Letter, at 2.

55.     Netflix's library of content has included some television series originally premiering on television broadcast stations, such as *The Blacklist*, *Cheers*, *Dynasty*, *Evil*, *Family Guy*, *Frasier*, *Glee*, *Gotham*, *Grey's Anatomy*, *Hannibal*, *How I Met Your Mother*, *How to Get Away with Murder*, *MacGyver*, *NCIS*, *New Girl*, *The Office*, *Rules of Engagement*, *Scrubs*, *Star Trek*, *Survivor*, *The Twilight Zone*, *Twin Peaks*, and *Will & Grace*.

56.     Netflix has competed for and won awards for excellence in television programming regarding its original television shows. For example, *House of Cards* was nominated for a Golden Globe® Award in 2014 and 2015 for Best Television Series – Drama and was nominated for an Emmy® Award in 2013, 2014, 2015, 2016, and 2017 for Outstanding Drama Series. *Stranger Things* was nominated for a Golden Globe® Award in 2017 and 2018 for Best Television Series – Drama and was nominated for an Emmy® Award in 2017, 2018, 2020 and 2022 for Outstanding Drama Series. *The Crown* won an Emmy® Award in 2021 for Outstanding Drama Series, beating out fellow Netflix nominee *Bridgerton* and NBC nominee *This is Us*, among others. *Cobra Kai*, *The Kominsky Method*, and *Emily in Paris* were nominated for an Emmy® Award in 2021 for Outstanding Comedy Series alongside ABC nominee *black-ish*. *Squid Game* was nominated for a Golden Globe® Award in 2022 for Best Drama Series and was nominated for an Emmy® Award in 2022 for Outstanding Drama Series. *Ozark* was also nominated for an Emmy® Award in 2022 for Outstanding Drama Series. *Bridgerton* won an Emmy® Award in 2021 for Outstanding Period and/or Character Hairstyling for its episode "Art of the Swoon." And *Queer Eye* won an Emmy® Award in 2020 for Outstanding Structured Reality Program.

57.     Hulu claims that its video programming is a viable alternative to cable and broadcast television. As one of Hulu's executives put it in a Hulu press release, "Hulu is the complete TV experience for consumers, offering both live and on-demand programming and more consumer choice than ever before." Exhibit B, May 2, 2018, Press Release.

58.     Hulu subscribers have been able to watch shows from networks that include, among others, ABC, CBS, FOX, NBC, TBS, TNT, and MTV.

59.     Hulu has also aired some current-season episodes the day after they air on television broadcast stations, such as *Saturday Night Live*, *Family Guy*, *The Voice*, *The Masked Singer*, *This is Us*, *Chicago P.D.*, *Debris*, *Big Sky*, and *The Simpsons*.

60.     Hulu has also aired some television series originally premiering on television broadcast stations, such as *The Brady Bunch*, *Cheers*, *Family Matters*, *Frasier*, *Full House*, *The Golden Girls*, *How I Met Your Mother*, *I Love Lucy*, *The Mary Tyler Moore Show*, *M\*A\*S\*H\**, *Modern Family*, *The Odd Couple*, *Perfect Strangers*, *Saved by the Bell*, *30 Rock*, *Wings*, and *The Wonder Years*.

61.     For the shows originally airing on traditional television broadcast stations that later appear on Hulu, the bulk of the content of those shows is the same.

62.     Subscribers to Hulu's Hulu +Live TV tier currently receive access to over 75 channels of live television.

63.     Hulu has competed for, and won, awards for excellence in television programming regarding its original television shows. For example, *The Handmaid's Tale* won a Golden Globe® Award in 2018 for Best Television Series – Drama and won an Emmy® Award in 2017 for Outstanding Drama Series. It was nominated for an Emmy® Award in 2021 for Outstanding Drama Series. *Pen15* was nominated for an Emmy® Award in 2021 for Outstanding Comedy Series. *Only Murders in the Building* was nominated for a Golden Globe® Award in 2022 for Best Musical/Comedy Series and was nominated for an Emmy® Award in 2022 for Outstanding Comedy Series in competition with fellow-nominee *Abbott Elementary* that appears on ABC. Also nominated for a Golden Globe® Award in 2022 for Best Musical/Comedy Series was Hulu show *The Great*. And *Dopesick* was nominated for a Golden Globe® Award in 2022 for Best Television Motion Picture.

64.     Disney, through its Disney+ service, "offers commercial-free programming with a

variety of original feature-length films, documentaries, live-action and animated series, and short-form content." Exhibit C, April 8, 2020, Press Release.

65.     Disney+ streaming service includes episodes of television shows that are available for streaming after originating on traditional broadcast networks. At various times, Disney+ has been able to provide its users with episodes of *The Simpsons*, *DuckTales*, *Schoolhouse Rock*, *Adventures of Gummi Bears*, *The Muppet Show*, and *Boy Meets World*.

66.     At various times, Disney+ has been able to provide its users with episodes of *Lizzie McGuire*, *That's So Raven*, *Hannah Montana*, *Wizards of Waverly Place*, *Liv and Maddie*, and *Austin & Ally*.

67.     Disney+ has competed for awards for excellence in television programming regarding its original television shows. For example, *The Mandalorian* was nominated for a Golden Globe® Award in 2021 for Drama TV Series and was nominated for an Emmy® Award in 2020 and 2021 for Outstanding Drama Series. *Chip 'n Dale: Rescue Rangers* was nominated for an Emmy® Award in 2022 for Outstanding Television Movie. And *The Beatles: Get Back* was nominated for an Emmy® Award in 2022 for Outstanding Documentary or Nonfiction Series.

68.     All Defendants charge subscribers a fee to access their video programming. To stream Netflix's video programming, Netflix subscribers must subscribe to one of three monthly plans: a $9.99 basic plan that allows subscribers to watch programming on one device at a time in 480p resolution, a $15.49 standard plan that allows subscribers to watch programming on two devices at a time in 1080p resolution, or a $19.99 premium plan that allows subscribers to watch programming on four devices at a time in 4K and HDR resolution.

69.     To stream Hulu's on-demand video programming, Hulu subscribers similarly must subscribe to a monthly plan. The current basic $6.99 plan is advertisement-supported, meaning it includes commercials. For $12.99 per month, subscribers can receive Hulu's programming without commercials.

70.     Hulu also currently offers a service for $69.99 per month called Hulu + Live TV

now with Disney+ and ESPN+. It combines access to Hulu's on-demand streaming libraries with live programming from over 75 TV channels, including the most popular sports, news, and entertainment channels. Hulu also offers the Hulu + Live TV now with Disney+ and ESPN+ plan without commercials for $75.99 per month. Additionally, Hulu offers other "add-on" features, including, *inter alia*, HBO, Cinemax, Showtime, STARZ, and enhanced DVR capabilities.

71.     Disney currently offers Disney+, its video-programming service, for $7.99 per month, or $79.99 per year. Disney also offers Disney+ bundled with ESPN+ (a sports-streaming program) and Hulu's basic, advertisement-supported on-demand service for $13.99 per month (or $19.99 per month with no advertisements).

72.     Defendants compete with cable television companies and with television broadcast stations like ABC, CBS, NBC, and FOX for viewers.

73.     In short, Defendants generate revenues by charging their subscribers to view professionally produced and copyrighted television shows, movies, documentaries, and other programming. Defendants therefore distribute "video programming" services to their subscribers in Texas. *See* Tex. Util. Code § 66.002(9) (defining "video programming" as "programming provided by, or generally considered comparable to programming provided by, a television broadcast station, as set forth in 47 U.S.C. Section 522(20)").

## II.    Disney, Hulu, and Netflix Provide Video Programming Services "Through Wireline Facilities Located at Least in Part in the Public Right-of-Way"

74.     Defendants transmit their video programming services through wireline facilities located at least in part in the public right-of-way.

75.     Subscribers view Defendants' video programming using devices—including, *inter alia*, smart televisions, streaming media players like Roku or Apple TV, and set-top boxes from cable and satellite providers—that have software enabling them to stream Defendants' video programming. *See, e.g.*, Exhibit D, *How does Netflix work?* When a subscriber wants to watch Netflix, Hulu, or Disney+, the companies deliver the video programming to the subscriber via

internet protocol technology.

76.     To deliver video programming, Defendants push their programming over local internet-service providers' local broadband facilities. This transmission takes place on wireline facilities within the public right-of-way, *i.e.*, the area on, below, or above a public roadway, highway, street, public sidewalk, alley, waterway, or utility easement in which the municipality has an interest. Tex. Util. Code § 66.002(8). Such wireline facilities are commonly located on utility poles or underground in such areas.

77.     All Defendants provide video programming services through wireline facilities located at least in part in the public right-of-way and, in some instances, entirely in the public right-of-way.

**III.    This Lawsuit Seeks the Recovery of Franchise Fees from Disney, Hulu, and Netflix, Who Have Failed to Pay Fees Despite Meeting the Statutory Definition of a "Video Service Provider" Who Sells "Video Service"**

78.     Because Defendants distribute video programming through "wireline facilities located at least in part in the public right-of-way," they are "video service providers" selling "video service" under PURA. Tex. Util. Code § 66.002(10)–(11). No exclusion applies, and Defendants are not commercial mobile service providers as defined by 47 U.S.C. § 332(d). Defendants must therefore pay franchise fees to Plaintiff municipalities under Texas Utilities Code § 66.005.

79.     Defendants have failed to comply with PURA by failing to seek a state-issued certificate of franchise authority as required (Tex. Util. Code § 66.003) and failing to pay franchise fees to the Plaintiff municipalities (Tex. Util. Code § 66.005). This lawsuit seeks, among other things, a declaration that Defendants are subject to PURA and follow-on equitable relief for the recovery of unpaid franchise fees for Plaintiffs.

80.     In addition to owing Plaintiffs franchise fees under state statutory causes of action, Defendants' unjust enrichment also violates the Gift Clauses of the Texas Constitution, which this Court must enforce.

81.     From the beginning, the Texas Constitution has zealously preserved the resources

and power of the government, especially in its prohibition of giving away public funds or resources to further private enterprise. These provisions of the Texas Constitution are known as the Gift Clauses.

82.     Specifically, the Gift Clauses of the Texas Constitution prohibit the collection or expenditure of public money for anything other than public purposes. "Taxes shall be levied and collected by general laws and for public purposes." Tex. Const. art. VIII, § 3. "No appropriation for private or individual purposes shall be made, unless authorized by this Constitution." Tex. Const. art. XVI, § 6(a).

83.     Similarly, Sections 50, 51, and 52 of Article III, and Section 3 of Article XI of the Texas Constitution provide that neither the Legislature nor any county, city, town, or other political subdivision may grant or donate public money or a thing of value to any individual, association of individuals, or corporation. *See* Tex. Const. art. III, § 50 ("The Legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the State in aid of, or to any person, association or corporation, whether municipal or other. . . ."); Tex. Const. art. III, § 51 ("The Legislature shall have no power to make any grant or authorize the making of any grant of public moneys to any individual, association of individuals, municipal or other corporations whatsoever. . . ."); Tex. Const. art. III, § 52(a) ("the legislature shall have no power to authorize any county, city, town or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever. . . ."); & Tex. Const. art. XI § 3 ("No county, city, or other municipal corporation shall hereafter become a subscriber to the capital of any private corporation or association, or make any appropriation or donation to the same . . . .").

84.     The Texas Supreme Court has found that the purposes of article III, sections 51 and 52 and article XVI, section 6 are "to prevent the application of public funds to private purposes." *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 739–40 (Tex. 1995) (citation omitted). In other words, it "prohibits the expenditure of public funds for private gain." *Graves v. Morales*, 923

S.W.2d 754, 757 (Tex. App.—Austin 1996, writ denied); *see also Tex. Mun. League Intergovernmental Risk Pool v. Tex. Workers' Comp. Comm'n*, 74 S.W.3d 377, 383 (Tex. 2002) ("We have held that section 52(a)'s prohibiting the Legislature from authorizing a political subdivision 'to grant public money' means that the Legislature cannot require *gratuitous* payments to individuals, associations, or corporations.") (*emphasis* in original); *Texas v. City of Austin*, 160 Tex. 348, 355 (1960) (finding the purpose of article III, section 51 and article XVI, section 6 is "to prevent the gratuitous grant of [public] funds to any individual or corporation whatsoever").

85.     Fulfilling the obligations of the Gift Clauses when it comes to the use of public rights of way by video service providers, the Texas Legislature enacted Chapter 66 of PURA, establishing that the usage of municipal public rights-of-way by Defendants was not to go uncompensated. Accordingly, Defendants' uncompensated usage of municipal public rights-of-way ultimately benefits only Defendants, which are private parties, in violation of the Gift Clauses. Defendants do not pay, and have not paid, franchise fees to Plaintiffs, and thus are using Plaintiffs' municipal public rights-of-way in violation of the Gift Clauses.

## COUNT ONE—REQUEST FOR DECLARATORY RELIEF

86.     Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

87.     Pursuant to Chapter 37 of the Civil Practice and Remedies Code, the Court should declare the following:

87.1.   Defendants are subject to PURA.

87.2.   Defendants are engaged in the business of providing video service in Plaintiffs' geographic areas within the meaning of Chapter 66 of PURA. Tex. Util. Code § 66.001 et. seq. Defendants derive "gross revenues" from their business (as defined by Tex. Util. Code § 66.002(6)), and they have engaged in their business and derived "gross revenues" from their business always since the provision of video service began.

87.3.   Defendants have failed to obtain a state-issued certificate of franchise authority from the Texas Public Utility Commission as required by Tex. Util. Code § 66.003(a).

87.4.   Defendants have failed to submit accountings to Plaintiffs, as required by PURA.

87.5.   Defendants have failed to pay franchise fees to Plaintiffs, as required by PURA.

87.6.   Defendants' failure to pay franchise fees to Plaintiffs unjustly enriches Defendants at the expense of Plaintiffs and violates the Gift Clauses of the Texas Constitution.

87.7.   Defendants' failure to pay franchise fees to Plaintiffs constitutes a trespass against Plaintiffs under Texas common law and the Texas Constitution.

87.8.   All such other declarations as are consistent with the relief requested herein or which is otherwise just and proper under the circumstances.

## COUNT TWO—REQUEST FOR INJUNCTIVE RELIEF

88.   Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

89.   Plaintiffs do not have an adequate remedy at law. Defendants' violations of PURA and the Texas Constitution are continuing, and Plaintiffs would be required to bring successive actions to enforce compliance and to collect unpaid fees.

90.   Unless Defendants are enjoined from violating the applicable statutes and constitutional provisions, Plaintiffs will continue to suffer irreparable harm or injury. Plaintiffs are being deprived of the required compensation for Defendants' usage of the municipal public rights-of-way needed to protect the public health, safety, and welfare of their citizens. Because Defendants intend to continue engaging in business within the jurisdictional limits of Plaintiffs and this Court, and deriving gross revenues from their business, Plaintiffs will continue to be

deprived of franchise fees unless Defendants are so enjoined. Plaintiff municipalities' recovery of statutorily required franchise fees is in the public interest.

91.    Pursuant to Chapters 37 and 65 of the Civil Practice and Remedies Code, the Court should permanently enjoin Defendants from using municipal public rights-of-way without contemporaneous and continuous compliance with all applicable provisions of the Texas Constitution and PURA.

<h2 align="center">COUNT THREE—REQUEST FOR AN ACCOUNTING</h2>

92.    Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

93.    Defendants have a duty to keep and maintain accurate books and records pertaining to the franchise fees owed to Plaintiffs. *See* Tex. Util. Code § 66.005(b). Upon information and belief, Defendants have not kept sufficient books and records necessary to calculate back-franchise fees owed for all prior years.

94.    Defendants have not accounted to Plaintiffs for the franchise fees owed to Plaintiffs.

95.    The Court should require Defendants to remit an accounting to Plaintiffs, in accordance with PURA.

<h2 align="center">COUNT FOUR—TRESPASS</h2>

96.    Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

97.    To the extent Defendants are found not liable under PURA for any reason, Defendants have committed a trespass against Plaintiffs under Texas common law and the Texas Constitution.

98.    Plaintiffs are both the owners and possessors of public right-of-way land within their respective boundaries.

99.    Defendants have wrongfully entered and used Plaintiffs' respective rights-of-way by delivering video programming to Texas customers without obtaining the proper state-issued

certificate of franchise authority from the Texas Public Utility Commission, without obtaining authorization from Plaintiffs, and without paying franchise fees or any other remuneration to Plaintiffs for such unauthorized use.

100.    Defendants have intentionally and knowingly trespassed upon these public rights-of-way. Defendants have operated, and continue to operate, for-profit businesses in which their utilization of Plaintiffs' public rights-of-way are central to their ability to generate profits from their sales to Texas customers. Defendants are aware of how their video delivery mechanisms work and understand that they have been using the public rights-of-way to affect such delivery. Defendants' intrusions upon the public rights-of-way are no innocent or inadvertent trespasses but are instead purposely directed to Plaintiffs' respective properties to enable Defendants to wrongfully profit on the backs of Plaintiffs and their citizens.

101.    Defendants' trespass upon Plaintiffs' property has damaged, and continues to damage, Plaintiffs.

### COUNT FIVE—UNJUST ENRICHMENT AND MONETARY RELIEF

102.    Plaintiffs repeat and incorporate by reference every allegation contained in the preceding paragraphs as if fully set forth herein.

103.    Defendants have operated as video service providers in the geographic areas of Plaintiffs.

104.    By not remitting franchise fees or any other sort of remuneration, Defendants have received the benefits of doing business in Plaintiffs' jurisdictions without paying required fees, have been aware that they were doing business without paying required fees and have accepted and retained these benefits under circumstances that are inequitable or unjust, *i.e.*, by depriving Plaintiffs of monies due under the statutes, codes, and provisions of law that Defendants refuse to honor.

105.    Defendants owe all Plaintiffs franchise fees, together with compounded interest (pre-judgment and post-judgment) and penalties, because of their failure to comply with the

applicable statutes, codes, and provisions of law since the provision of video service began and for the duration of this litigation.

## COUNT SIX—REQUEST FOR ATTORNEY'S FEES

106.    Plaintiffs have incurred and will continue to incur costs and attorney's fees needed for the investigation and prosecution of these claims. Plaintiffs' counsel should recover these fees and expenditures pursuant to applicable law.

## PRAYER FOR RELIEF

107.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that the Court award the following relief:

108.    That the Court declare and adjudge that Defendants are subject to PURA and have failed to comply with its requirements including, *inter alia*, obtaining the required state-issued certificate of franchise authority and remitting to Plaintiffs the franchise fees owed.

109.    That the Court declare and adjudge that Defendants' uncompensated use of the public right-of-way violates the Gift Clauses of the Texas Constitution.

110.    That the Court adjudge that Defendants' unauthorized use of the public right-of-way caused Defendants to be unjustly enriched, as they avoided fees that should have been paid to Plaintiffs since the provision of video service began and for the duration of this litigation.

111.    That the Court adjudge that Defendants' have trespassed upon Plaintiffs' property since the provision of video service began and for the duration of this litigation.

112.    That the Court order an accounting of all monies that Defendants owe Plaintiffs, including compounded interest (pre-judgment and post-judgment).

113.    That the Court award Plaintiffs money damages for the amounts that Defendants have been unjustly enriched at Plaintiffs' expense, including compounded interest (pre-judgment and post-judgment) and penalties.

114.    That the Court award Plaintiffs compensatory and punitive damages for trespass in an amount to be proven at trial and as the jury deems appropriate, including compounded interest

(pre-judgment and post-judgment) and penalties.

115.     That the Court hold a full trial on the merits, and, after the trial, grant a permanent injunction against Defendants requiring regular accountings, timely remittance of franchise fees to Plaintiffs, and enjoining and restraining Defendants from engaging in business within the boundaries of Plaintiffs and deriving gross revenues therefrom without obtaining the required state-issued certificate of franchise authority and without paying the required franchise fees.

116.     That the Court hold a full trial on the merits, and, after the trial, a permanent injunction be granted against Defendants enjoining and restraining Defendants from further trespass upon Plaintiffs' property.

117.     Plaintiffs also seek attorney's fees under Chapter 37 of the Civil Practices and Remedies Code, plus their costs of court and expenses, including expert witness fees.

118.     Plaintiffs also seek such other relief to which the Court determines Plaintiffs are entitled or which is otherwise just and proper under the circumstances.

### REQUEST FOR DISCLOSURE

119.     Plaintiffs request that Defendants disclose, within 50 days of the service of this request, the information or material described in Texas Rule of Civil Procedure 194.2.

> */s/ Steven Wolens*
> Steven D. Wolens
> Texas Bar No. 21847600
> Gary Cruciani
> Texas Bar No. 05177300
>
> McKool Smith, P.C.
> 300 Crescent Court, Ste. 1500
> Dallas, TX 75201
> Phone: (214) 978-4000
> swolens@mckoolsmith.com
> gcruciani@mckoolsmith.com

*/s/ Austin R. Nimocks*
Austin R. Nimocks
Texas Bar No. 24002695
Johnny K. Sutton
Texas Bar No. 19534250
Luis A. Reyes
Texas Bar No. 90001831
Christopher L. Peele
Texas Bar No. 24013308
Cory R. Liu
Texas Bar No. 24098003

ASHCROFT SUTTON REYES LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
animocks@ashcroftlawfirm.com
jsutton@ashcroftlawfirm.com
lreyes@ashcroftlawfirm.com
cpeele@ashcroftlawfirm.com
cliu@ashcroftlawfirm.com

Steven M. Berezney (application for admission *pro hac vice* pending)
Missouri Bar No. 56091
Garrett R. Broshuis (application for admission *pro hac vice* pending)
Missouri Bar No. 65805

KOREIN TILLERY LLC
505 N. 7th St., Ste. 3600
St. Louis, MO 63101
Phone: (314) 241-4844
Fax: (314) 241-1854
sberezney@koreintillery.com
gbroshuis@koreintillery.com

*Attorneys for Plaintiffs*

On Behalf of City of Dallas
Christopher J. Caso
Texas Bar No. 03969230

CITY OF DALLAS
1500 Marilla St., Ste. 7DN
Dallas, TX 75201
(214) 670-3519
chris.caso@dallascityhall.com

On Behalf of City of Abilene
Stanley E. Smith
Texas Bar No. 00791694

CITY OF ABILENE
555 Walnut St., Ste. 208
Abilene, TX 79601
(325) 676-6251
stanley.smith@abilenetx.gov

On Behalf of the City of Amarillo
Bryan McWilliams
Texas Bar No. 24049776

CITY OF AMARILLO
601 S. Buchanan
Amarillo, TX 79101
(806) 378-3000
bryan.mcwilliams@amarillo.gov

On Behalf of the City of Arlington
Teris Solis
Texas Bar No. 02899850
David Johnson
Texas Bar No. 24060026

CITY OF ARLINGTON
Mail Stop 63-0300
101 S. Mesquite St., Ste. 300
Arlington, TX 76010
(817) 459-6878
teris.solis@arlingtontx.gov

On Behalf of the City of Austin
Anne L. Morgan
City Attorney
Texas Bar No. 14432400

CITY OF AUSTIN
Law Department
P.O. Box 1088
Austin, TX 78767-1088
(512) 974-2268
anne.morgan@austintexas.gov

On Behalf of the City of Beaumont
Sharae N. Reed
City Attorney
Texas Bar No. 24068467

CITY OF BEAUMONT
P.O. Box 3827
Beaumont, TX 77704-3827
(409) 880-3715
sharae.reed@beaumonttexas.gov


On Behalf of City of Carrollton
Meredith A. Ladd
Texas Bar No. 24003368

CITY OF CARROLLTON
1945 E. Jackson Rd.
Carrollton, TX 75006
(972) 466-3000
meredith.ladd@cityofcarrollton.com


On Behalf of City of Denton
Mack P. Reinwand
Texas Bar No. 24056195

CITY OF DENTON
215 E. McKinney St.
Denton, TX 76201
(940) 349-8333
mack.reinwand@cityofdenton.com


On Behalf of City of Fort Worth
Laetitia Coleman Brown
Texas Bar No. 00792417

CITY OF FORT WORTH
City Hall
200 Texas St.
Fort Worth, TX 76102
(817) 392-7600
laetitia.coleman@fortworthtexas.gov

On Behalf of City of Frisco
Richard M. Abernathy
Texas Bar No. 00809500

CITY OF FRISCO
Abernathy, Roeder, Boyd & Hullett P.C.
1700 Redbud Blvd., Ste. 300
McKinney, TX 75069
(214) 544-4000
rabernathy@abernathy-law.com

On Behalf of City of Garland
Brian England
Texas Bar No. 24059722

CITY OF GARLAND
200 N. Fifth St.
Garland, TX 75040
(972) 205-2380
bengland@garlandtx.gov

On Behalf of City of Grand Prairie
Megan Mahan
Texas Bar No. 24061203

CITY OF GRAND PRAIRIE
P.O. Box 534045
Grand Prairie, TX 75053
(972) 237-8026
mmahan@gptx.org

On Behalf of City of Houston
Arturo Michel
Texas Bar No. 14009440
YuShan Chang
Texas Bar No. 24040670

CITY OF HOUSTON
Legal Department
900 Bagby St., 4th Fl.
Houston, TX 77002
(832) 393-6442
arturo.michel@houstontx.gov
yushan.chang@houstontx.gov

On Behalf of City of Houston
Ana Hernandez
Texas Bar No. 24046062

CITY OF HOUSTON
Ana Hernandez & Associates, PLLC
4101 Washington Ave.
Houston, TX 77007
(713) 337-3930
ana@anahlaw.com

On Behalf of City of Irving
Kuruvilla Oommen
City Attorney
Texas Bar No. 24007780
Janet Spugnardi
Deputy City Attorney
Texas Bar No. 24039192

CITY OF IRVING
825 W. Irving Blvd.
Irving, TX 75060
(972) 721-2541 x3656
koommen@cityofirving.org
jspugnardi@cityofirving.org

On Behalf of City of Lewisville
Lizbeth I. Plaster
City Attorney
Texas Bar No. 00787750

CITY OF LEWISVILLE
P.O. Box 299002
Lewisville, TX 75029-9002
(972) 219-5059
lplaster@cityoflewisville.com

On Behalf of City of McKinney
Mark S. Houser
Texas Bar No. 10049500

CITY OF MCKINNEY
Brown & Hofmeister, L.L.P.
740 East Campbell Rd., Ste. 800
Richardson, TX 75081
(214) 747-6100
mhouser@bhlaw.net

On Behalf of City of Mesquite
David L. Paschall
Texas Bar No. 15553800

CITY OF MESQUITE
1515 N. Galloway Ave.
Mesquite, TX 75149
(972) 216-6272
dpaschall@cityofmesquite.com

On Behalf of City of Nacogdoches
Steven Kirkland
City Attorney
Texas Bar No. 11522200

CITY OF NACOGDOCHES
P.O. Box 635030
Nacogdoches, TX 75963
(936) 559-2503
kirklands@nactx.us

On Behalf of City of Pearland
Darrin M. Coker
Texas Bar No. 00795023

CITY OF PEARLAND
3519 Liberty Dr.
Pearland, TX 77581
(281) 652-1600
dcoker@pearlandtx.gov

On Behalf of City of Plano
Paige Mims
Texas Bar No. 00787550

CITY OF PLANO
1520 K Ave., Ste. 340
Plano, TX 75074
(972) 941-7125
paigem@plano.gov

On Behalf of City of Rowlett
David Berman
Texas Bar No. 02206990

CITY OF ROWLETT
Nichols, Jackson, Dillard, Hager & Smith
1800 Ross Tower
500 N. Akard St.
Dallas, TX 75201
(214) 965-9900
dberman@njdhs.com

On Behalf of City of Sugar Land
Meredith Riede
Texas Bar No. 24025614

CITY OF SUGAR LAND
P.O. Box 110
Sugar Land, TX 77487-0110
(281) 275-2700
mriede@sugarlandtx.gov

On Behalf of City of Tyler
Deborah Pullum
City Attorney
Texas Bar No. 00797269

CITY OF TYLER
P.O. Box 2039
Tyler, TX 75710
(903) 531-1161
dpullum@tylertexas.com

On Behalf of City of Waco
Jennifer Richie
Texas Bar No. 24007916

CITY OF WACO
P.O. Box 2570
Waco, TX 76702
(254) 750-5680
jenniferr@wacotx.gov

# Exhibit A

April 16, 2018

Fellow shareholders,

We strive to entertain and to bring joy to people across the world through amazing stories. Our 125 million members provided us with $3.6 billion in streaming revenue in Q1. Our job is to spend this money wisely to increase our members' delight.

| (in millions except per share data and Streaming Content Obligations) | Q1'17 | | Q2'17 | | Q3'17 | | Q4'17 | | Q1'18 | | Q2'18 Forecast | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total (Including DVD):** | | | | | | | | | | | | |
| Revenue | $ | 2,637 | $ | 2,785 | $ | 2,985 | $ | 3,286 | $ | 3,701 | $ | 3,934 |
| Y/Y % Growth | | 34.7% | | 32.3% | | 30.3% | | 32.6% | | 40.4% | | 41.2% |
| **Operating Income** | $ | 257 | $ | 128 | $ | 209 | $ | 245 | $ | 447 | | 469 |
| **Operating Margin** | | 9.7% | | 4.6% | | 7.0% | | 7.5% | | 12.1% | | 11.9% |
| **Net Income** | $ | 178 | $ | 66 | $ | 130 | $ | 186 | $ | 290 | $ | 358 |
| **Diluted EPS** | $ | 0.40 | $ | 0.15 | $ | 0.29 | $ | 0.41 | $ | 0.64 | $ | 0.79 |
| Total Streaming: | | | | | | | | | | | | |
| Revenue | $ | 2,516 | $ | 2,671 | $ | 2,875 | $ | 3,181 | $ | 3,602 | $ | 3,841 |
| Y/Y % Growth | | 38.8% | | 35.8% | | 33.2% | | 35.3% | | 43.2% | | 43.8% |
| **Paid Memberships** | | 94.36 | | 99.04 | | 104.02 | | 110.64 | | 118.90 | | 125.00 |
| **Total Memberships** | | 98.75 | | 103.95 | | 109.25 | | 117.58 | | 125.00 | | 131.20 |
| **Net Additions** | | 4.95 | | 5.20 | | 5.30 | | 8.33 | | 7.41 | | 6.20 |
| US Streaming: | | | | | | | | | | | | |
| Revenue | $ | 1,470 | $ | 1,505 | $ | 1,547 | $ | 1,630 | $ | 1,820 | $ | 1,898 |
| **Contribution Profit** | $ | 606 | $ | 560 | $ | 554 | $ | 561 | $ | 697 | $ | 751 |
| **Contribution Margin** | | 41.2% | | 37.2% | | 35.8% | | 34.4% | | 38.3% | | 39.6% |
| **Paid Memberships** | | 49.38 | | 50.32 | | 51.35 | | 52.81 | | 55.09 | | 56.29 |
| **Total Memberships** | | 50.85 | | 51.92 | | 52.77 | | 54.75 | | 56.71 | | 57.91 |
| **Net Additions** | | 1.42 | | 1.07 | | 0.85 | | 1.98 | | 1.96 | | 1.20 |
| International Streaming: | | | | | | | | | | | | |
| Revenue | $ | 1,046 | $ | 1,165 | $ | 1,327 | $ | 1,550 | $ | 1,782 | $ | 1,943 |
| **Contribution Profit (Loss)** | $ | 43 | $ | (13) | $ | 62 | $ | 135 | $ | 272 | $ | 274 |
| **Contribution Margin** | | 4.1% | | -1.1% | | 4.7% | | 8.7% | | 15.3% | | 14.1% |
| **Paid Memberships** | | 44.99 | | 48.71 | | 52.68 | | 57.83 | | 63.82 | | 68.72 |
| **Total Memberships** | | 47.89 | | 52.03 | | 56.48 | | 62.83 | | 68.29 | | 73.29 |
| **Net Additions** | | 3.53 | | 4.14 | | 4.45 | | 6.36 | | 5.46 | | 5.00 |
| Consolidated: | | | | | | | | | | | | |
| Net cash (used in) operating activities | $ | (344) | $ | (535) | $ | (420) | $ | (488) | $ | (237) | | |
| **Free Cash Flow** | $ | (423) | $ | (608) | $ | (465) | $ | (524) | $ | (287) | | |
| **EBITDA** | $ | 317 | $ | 190 | $ | 273 | $ | 313 | $ | 534 | | |
| **Shares (FD)** | | 445.5 | | 446.3 | | 447.4 | | 448.1 | | 450.4 | | |
| **Streaming Content Obligations* ($B)** | | 15.3 | | 15.7 | | 17.0 | | 17.7 | | 17.9 | | |

*Corresponds to our total known streaming content obligations as defined in our financial statements and related notes in our most recently filed SEC Form 10-K



# Q1 Results and Q2 Forecast

Revenue grew 43% year over year in Q1, the fastest pace in the history of our streaming business, due to a 25% increase in average paid streaming memberships and a 14% rise in ASP. Operating margin of 12% rose 232 bps year over year. This was higher than our beginning of quarter guidance, due primarily to the timing of content spend. Diluted EPS of $0.64 vs. $0.40 included a $41m non-cash unrealized loss from F/X remeasurement on our Eurobond.

Global net adds totaled a new Q1-record of 7.41m, up 50% year over year and ahead of our 6.35m forecast. The variance relative to our guidance was driven by continued strong acquisition trends across the globe which we attribute to the growing breadth of our content and the worldwide adoption of internet entertainment.

In the US, we added 1.96m memberships (compared with forecast of 1.45m). We completed our price adjustment during this past quarter, resulting in 12% ASP growth for the domestic segment. Outside of the US, membership grew by 5.46m (vs. forecast of 4.90m). Our international segment now accounts for 50% of revenue and 55% of memberships. Excluding a F/X impact of +$114 million, international revenue and ASP rose 59% and 13% year over year, respectively.

As a reminder, the quarterly guidance we provide is our internal forecast at the time we report. For Q2, we expect 6.2 million global net additions (1.2m in the US and 5.0m for the international segment) vs. 5.2 million in the year ago quarter. Q2 operating margin is expected to be 12%. We are now targeting a full year operating margin of 10%-11%. We continue to anticipate content and marketing spend to be weighted towards the second half of 2018.

# Content

We'll have $7.5-$8 billion of content expense (on a P&L basis) in 2018 across a wide variety of formats (series, films, unscripted, docs, comedy specials, non-English language) to serve the diverse tastes of our growing global membership base.

Q1 scripted original series debuts included the dark, coming of age story *The End of the F***ing World* and sci-fi thriller *Altered Carbon* as well as returning seasons of *Marvel's Jessica Jones*, *Grace and Frankie*, *Santa Clarita Diet* and *A Series of Unfortunate Events*.

Last year, we expanded our efforts in original programming to unscripted shows across several genres. Our output in this area is now comparable to similarly-focused US domestic cable networks. Shows like *Queer Eye* and *Nailed It* are great examples of our ambitions in this area: engaging, buzz-worthy shows that drive lots of enjoyment around the world.

Our investment in international production continued to increase with big, non-English originals like *O Mecanismo (The Mechanism)*. Loosely inspired by real events and from *Narcos* creator José Padilha, this drama is tracking to be one of our most viewed originals in Brazil. We are also seeing more examples of non-English content transcending borders. This quarter, *La Casa de Papel* (*Money Heist* in English



language territories), a Spanish language heist thriller, became the most watched non-English series on Netflix ever.

On Super Bowl Sunday, we surprise-announced and launched *The Cloverfield Paradox*, the third film in the *Cloverfield* franchise. Through tight coordination among our original film, product, marketing and PR teams, the event showcased how a big branded film can be marketed and delivered to consumers instantaneously across the globe without a wait for the theatrical window. Outside of North America, we premiered the Alex Garland-directed *Annihilation*, starring Natalie Portman, just weeks after its US theatrical debut and it has enjoyed large audiences in nearly every country for us. We also released a broad range of original films: from *Benji* for kids and families; to the Seth Rogen/Evan Goldberg produced comedy *Game Over, Man*; to the Sundance hip-hop biopic *Roxanne, Roxanne*.

We regret our films not being able to compete at this year's Cannes film festival. The festival adopted a new rule that means if a film is in competition at Cannes, it can not be watched on Netflix in France for the following three years[1]. We would never want to do that to our French members. We will continue to celebrate our films and filmmakers at other festivals around the world but unfortunately we will have to sit out Cannes for now so that our growing French membership can continue to enjoy our original films.

This past quarter, we signed an overall deal with Ryan Murphy, the prolific hit-maker behind *American Crime Story: The People vs. OJ Simpson*, *Nip/Tuck*, *Glee*, *American Horror Story* and many others. This comes on the heels of similar partnerships with Shonda Rhimes, Shawn Levy and Jenji Kohan. While these overall deals are a substantial investment for us, they allow us to work directly with prolific and talented creators with a proven track record of success. Instead of having to license their shows for a finite period from outside suppliers, we will own the projects we produce with them. This approach also allows us to reduce our reliance on third-party studios and forego the corresponding license premiums we've historically paid.

We were proud to celebrate our first feature Academy Award with Bryan Fogel and Dan Cogan, makers of our documentary *Icarus.* We're thrilled when the creators with whom we partner are recognized for their exceptional work. The Oscar win helps to reinforce that Netflix is a great home for both documentary lovers and creators.

# Marketing

We're investing in more marketing of new original titles to create more density of viewing and conversation around each title (i.e bigger hit in a nation or demographic). We believe this density of viewing helps on both retention and acquisition, because it makes our original titles even less substitutable. Because we operate in so many countries, we are able to try different approaches in different markets, and continue to learn.

---

[1] Specifically, the Cannes festival's new rule is that a French theatrical opening is required of films in competition, and French law in essence requires that if a film is in French theatres, then it cannot be on an SVOD service in France for 36 months. While in other countries we can offer simultaneous exhibition in theatres and on Netflix, that is not permitted in France, so we have to be Netflix-only for our films in France.



## Product and Partnerships

Last year, we launched bundle offers with Proximus (in Belgium), SFR Altice (France) and T-Mobile (US). They have proven to be very successful and we are now adding similar bundle offers with additional MVPD partners. Recently, we announced that we are bundling the Netflix service with packages from Sky which will begin later this year and with Comcast in the US, which are currently being rolled out. These relationships allow our partners to attract more customers and to upsell existing subscribers to higher ARPU packages, while we benefit from more reach, awareness and often, less friction in the signup and payment process. We believe that the lower churn in these bundles offsets the lower Netflix ASP. We remain primarily a direct-to-consumer business, but we see our bundling initiative as an attractive supplemental channel.

In March, we rolled out additional features providing members with greater information and control over their Netflix viewing. While we had already offered PIN protection for all content at a certain maturity level, there is now a parental PIN control for individual movies and shows. These new features are part of our ongoing effort to give our members tools to manage how they and their families enjoy Netflix.

## Free Cash Flow and Capital Structure

Free cash flow in Q1 was -$287 million (less negative than we expected due to content payment timing differences), compared with -$524 million in Q4'17. We continue to forecast free cash flow of -$3 to -$4 billion in 2018, and to be free cash flow negative for several more years as our original content spend rapidly grows.

We have about $2.6 billion in cash and we will continue to raise debt as needed to fund our increase in original content. Our debt levels are quite modest as a percentage of our enterprise value, and we believe the debt is lower cost of capital compared to equity.

## Board of Directors

We're pleased to add Ambassador Susan Rice to our board of directors. Susan is a former National Security Advisor and United States Ambassador to the United Nations. As a global company operating in over 190 countries, Susan's expertise in international affairs will be valuable.

## Reference

For quick reference, our eight most recent investor letters are: January 2018, October 2017, July 2017, April 2017, January 2017, October 2016, July 2016, April 2016.



4

# Earnings Video Interview, 3pm PST

Our video interview with Ben Swinburne of Morgan Stanley will be on youtube/netflixir at 3pm PST today.  Questions that investors would like to see asked should be sent to benjamin.swinburne@morganstanley.com. Reed Hastings, CEO, David Wells, CFO, Ted Sarandos, Chief Content Officer, Greg Peters, Chief Product Officer and Spencer Wang, VP of IR/Corporate Development will all be on the video to answer Ben's questions.

| IR Contact: | PR Contact: |
|---|---|
| Spencer Wang | Jonathan Friedland |
| Vice President, Finance/IR & Corporate Development | Chief Communications Officer |
| 408 809-5360 | 310 734-2958 |

## Use of Non-GAAP Measures

This shareholder letter and its attachments include reference to the non-GAAP financial measure of free cash flow and EBITDA. Management believes that free cash flow and EBITDA are important liquidity metrics because they measure, during a given period, the amount of cash generated that is available to repay debt obligations, make investments and for certain other activities or the amount of cash used in operations, including investments in global streaming content. However, these non-GAAP measures should be considered in addition to, not as a substitute for or superior to, net income, operating income, diluted earnings per share and net cash provided by operating activities, or other financial measures prepared in accordance with GAAP. Reconciliation to the GAAP equivalent of these non-GAAP measures are contained in tabular form on the attached unaudited financial statements.

## Forward-Looking Statements

This shareholder letter contains certain forward-looking statements within the meaning of the federal securities laws, including statements regarding content and marketing spend and strategy, including outside the US; content performance; future capital raises; domestic and international net, total and paid subscribers; revenue; contribution profit (loss) and contribution margin for both domestic international operations, as well as consolidated operating income, operating margin; net income, earnings per share and free cash flow.  The forward-looking statements in this letter are subject to risks and uncertainties that could cause actual results and events to differ, including, without limitation: our ability to attract new members and retain existing members; our ability to compete effectively; maintenance and expansion of device platforms for streaming; fluctuations in consumer usage of our service; service disruptions; production risks; actions of Internet Service Providers; and, competition, including consumer adoption of different modes of viewing in-home filmed entertainment. A detailed discussion of these and other risks and uncertainties that could cause actual results and events to differ materially from such forward-looking statements is included in our filings with the Securities and



5

Exchange Commission, including our Annual Report on Form 10-K, as amended by Form 10-K/A, filed with the Securities and Exchange Commission on February 5, 2018. The Company provides internal forecast numbers. Investors should anticipate that actual performance will vary from these forecast numbers based on risks and uncertainties discussed above and in our Annual Report on Form 10-K, as amended by Form 10-K/A. We undertake no obligation to update forward-looking statements to reflect events or circumstances occurring after the date of this shareholder letter.



6

**Consolidated Statements of Operations**
(unaudited)
(in thousands, except per share data)

| | Three Months Ended | | |
| --- | --- | --- | --- |
| | March 31, 2018 | December 31, 2017 | March 31, 2017 |
| Revenues | $    3,700,856 | $    3,285,755 | $    2,636,635 |
| Cost of revenues | 2,196,075 | 2,107,354 | 1,657,024 |
| Marketing | 479,222 | 419,939 | 271,270 |
| Technology and development | 300,730 | 273,351 | 257,108 |
| General and administrative | 278,251 | 239,808 | 194,291 |
| Operating income | 446,578 | 245,303 | 256,942 |
| Other income (expense): | | | |
| Interest expense | (81,219) | (75,292) | (46,742) |
| Interest and other income (expense) | (65,743) | (38,681) | 13,592 |
| Income before income taxes | 299,616 | 131,330 | 223,792 |
| Provision for (benefit from) income taxes | 9,492 | (54,187) | 45,570 |
| Net income | $     290,124 | $     185,517 | $     178,222 |
| Earnings per share: | | | |
| Basic | $        0.67 | $        0.43 | $        0.41 |
| Diluted | $        0.64 | $        0.41 | $        0.40 |
| Weighted-average common shares outstanding: | | | |
| Basic | 434,174 | 433,108 | 430,600 |
| Diluted | 450,359 | 448,142 | 445,458 |



**Netflix, Inc.**

**Consolidated Balance Sheets**
(unaudited)
(in thousands)

| | As of | |
| --- | --- | --- |
| | March 31, 2018 | December 31, 2017 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 2,593,666 | $ 2,822,795 |
| Current content assets, net | 4,626,522 | 4,310,934 |
| Other current assets | 597,388 | 536,245 |
| Total current assets | 7,817,576 | 7,669,974 |
| Non-current content assets, net | 11,314,803 | 10,371,055 |
| Property and equipment, net | 341,932 | 319,404 |
| Other non-current assets | 678,486 | 652,309 |
| Total assets | $ 20,152,797 | $ 19,012,742 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Current content liabilities | $ 4,466,081 | $ 4,173,041 |
| Accounts payable | 436,183 | 359,555 |
| Accrued expenses | 429,431 | 315,094 |
| Deferred revenue | 673,892 | 618,622 |
| Total current liabilities | 6,005,587 | 5,466,312 |
| Non-current content liabilities | 3,444,476 | 3,329,796 |
| Long-term debt | 6,542,373 | 6,499,432 |
| Other non-current liabilities | 139,631 | 135,246 |
| Total liabilities | 16,132,067 | 15,430,786 |
| Stockholders' equity: | | |
| Common stock | 1,995,225 | 1,871,396 |
| Accumulated other comprehensive income (loss) | 4,264 | (20,557) |
| Retained earnings | 2,021,241 | 1,731,117 |
| Total stockholders' equity | 4,020,730 | 3,581,956 |
| Total liabilities and stockholders' equity | $ 20,152,797 | $ 19,012,742 |



**Consolidated Statements of Cash Flows**
(unaudited)
(in thousands)

| | Three Months Ended | | |
| --- | --- | --- | --- |
| | March 31, 2018 | December 31, 2017 | March 31, 2017 |
| **Cash flows from operating activities:** | | | |
| Net income | $ 290,124 | $ 185,517 | $ 178,222 |
| Adjustments to reconcile net income to net cash used in operating activities: | | | |
| Additions to streaming content assets | (2,986,747) | (2,477,659) | (2,348,666) |
| Change in streaming content liabilities | 378,885 | 53,446 | 366,257 |
| Amortization of streaming content assets | 1,748,844 | 1,713,863 | 1,305,683 |
| Amortization of DVD content assets | 11,134 | 12,289 | 18,598 |
| Depreciation and amortization of property, equipment and intangibles | 19,041 | 19,073 | 15,049 |
| Stock-based compensation expense | 68,395 | 48,530 | 44,888 |
| Other non-cash items | 8,209 | 14,126 | 21,666 |
| Foreign currency remeasurement loss on long-term debt | 41,080 | 25,740 | — |
| Deferred taxes | (22,049) | (104,132) | (26,764) |
| Changes in operating assets and liabilities: | | | |
| Other current assets | (55,905) | (87,090) | (25,402) |
| Accounts payable | 74,083 | 63,969 | (11,000) |
| Accrued expenses | 119,049 | (5,169) | 93,542 |
| Deferred revenue | 55,270 | 83,197 | 15,221 |
| Other non-current assets and liabilities | 13,830 | (33,657) | 8,850 |
| Net cash used in operating activities | (236,757) | (487,957) | (343,856) |
| **Cash flows from investing activities:** | | | |
| Acquisition of DVD content assets | (10,796) | (10,507) | (25,372) |
| Purchases of property and equipment | (37,170) | (21,585) | (52,523) |
| Change in other assets | (1,786) | (3,749) | (769) |
| Purchases of short-term investments | — | — | (57,774) |
| Proceeds from sale of short-term investments | — | — | 55,748 |
| Proceeds from maturities of short-term investments | — | — | 5,100 |
| Net cash used in investing activities | (49,752) | (35,841) | (75,590) |
| **Cash flows from financing activities:** | | | |
| Proceeds from issuance of common stock | 56,335 | 14,705 | 24,178 |
| Proceeds from issuance of debt | — | 1,600,000 | — |
| Issuance costs | — | (16,828) | — |
| Other financing activities | (321) | 66 | 61 |
| Net cash provided by financing activities | 56,014 | 1,597,943 | 24,239 |
| Effect of exchange rate changes on cash, cash equivalents, and restricted cash | 7,177 | 2,181 | 5,455 |
| Net decrease in cash, cash equivalents, and restricted cash | (223,318) | 1,076,326 | (389,752) |
| Cash, cash equivalents, and restricted cash at beginning of period | 2,822,795 | 1,746,469 | 1,467,576 |
| Cash, cash equivalents, and restricted cash at end of period | $ 2,599,477 | $ 2,822,795 | $ 1,077,824 |

| | Three Months Ended | | |
| --- | --- | --- | --- |
| | March 31, 2018 | December 31, 2017 | March 31, 2017 |
| **Non-GAAP free cash flow reconciliation:** | | | |
| Net cash used in operating activities | $ (236,757) | $ (487,957) | $ (343,856) |
| Acquisition of DVD content assets | (10,796) | (10,507) | (25,372) |
| Purchases of property and equipment | (37,170) | (21,585) | (52,523) |
| Change in other assets | (1,786) | (3,749) | (769) |
| **Non-GAAP free cash flow** | $ (286,509) | $ (523,798) | $ (422,520) |



**Netflix, Inc.**

**Segment Information**
(unaudited)
(in thousands)

| | As of / Three Months Ended | | |
| --- | --- | --- | --- |
| | March 31, 2018 | December 31, 2017 | March 31, 2017 |
| **Domestic Streaming** | | | |
| Total memberships at end of period | 56,705 | 54,750 | 50,854 |
| Paid memberships at end of period | 55,087 | 52,810 | 49,375 |
| Revenues | $ 1,820,019 | $ 1,630,274 | $ 1,470,042 |
| Cost of revenues | 894,873 | 873,372 | 749,488 |
| Marketing | 228,022 | 195,784 | 115,038 |
| Contribution profit | 697,124 | 561,118 | 605,516 |
| | | | |
| **International Streaming** | | | |
| Total memberships at end of period | 68,290 | 62,832 | 47,894 |
| Paid memberships at end of period | 63,815 | 57,834 | 44,988 |
| Revenues | $ 1,782,086 | $ 1,550,329 | $ 1,046,199 |
| Cost of revenues | 1,258,809 | 1,191,497 | 847,317 |
| Marketing | 251,200 | 224,155 | 156,232 |
| Contribution profit | 272,077 | 134,677 | 42,650 |
| | | | |
| **Domestic DVD** | | | |
| Total memberships at end of period | 3,167 | 3,383 | 3,944 |
| Paid memberships at end of period | 3,138 | 3,330 | 3,867 |
| Revenues | $ 98,751 | $ 105,152 | $ 120,394 |
| Cost of revenues | 42,393 | 42,485 | 60,219 |
| Contribution profit | 56,358 | 62,667 | 60,175 |
| | | | |
| **Consolidated** | | | |
| Revenues | $ 3,700,856 | $ 3,285,755 | $ 2,636,635 |
| Cost of revenues | 2,196,075 | 2,107,354 | 1,657,024 |
| Marketing | 479,222 | 419,939 | 271,270 |
| Contribution profit | 1,025,559 | 758,462 | 708,341 |
| Other operating expenses | 578,981 | 513,159 | 451,399 |
| Operating income | 446,578 | 245,303 | 256,942 |
| Other expense | (146,962) | (113,973) | (33,150) |
| Provision for (benefit from) income taxes | 9,492 | (54,187) | 45,570 |
| Net income | $ 290,124 | $ 185,517 | $ 178,222 |



10

**Netflix, Inc.**

**Non-GAAP Information**
(unaudited)
(in thousands)

| | March 31, 2017 | June 30, 2017 | September 30, 2017 | December 31, 2017 | March 31, 2018 |
|---|---|---|---|---|---|
| Non-GAAP Adjusted EBITDA reconciliation: | | | | | |
| GAAP net income | $ 178,222 | $ 65,600 | $ 129,590 | $ 185,517 | $ 290,124 |
| Add: | | | | | |
| Other expense | 33,150 | 113,845 | 92,390 | 113,973 | 146,962 |
| Provision for (benefit from) income taxes | 45,570 | (51,638) | (13,353) | (54,187) | 9,492 |
| Depreciation and amortization of property, equipment and intangibles | 15,049 | 18,551 | 19,238 | 19,073 | 19,041 |
| Stock-based compensation expense | 44,888 | 44,028 | 44,763 | 48,530 | 68,395 |
| Adjusted EBITDA | $ 316,879 | $ 190,386 | $ 272,628 | $ 312,906 | $ 534,014 |



# Exhibit B

HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER – Hulu Press Site

Case 3:22-cv-02071-L   Document 1-6   Filed 09/16/22   Page 42 of 67   PageID 84

**hulu** PRESS

Hulu Updates     Tech Blog ☐

May 2, 2018

# HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER

Acquisitions, Advertising, Business, Content, Distribution, Movies, Originals, Product, Technology, Uncategorized

HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS

HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER – Hulu Press Site

AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER

Case 3:22-cv-02071-L   Document 1-6   Filed 09/16/22   Page 43 of 67   PageID 85

*Premium Streaming Service Reports 60 Percent Jump In Engagement and*

*Reveals 78 Percent of Viewing on Hulu Takes Place In The Living Room*

*Company Expands Originals Slate with Series Orders for* Four Weddings and a Funeral *from Mindy*

*Kaling and New Comedy Series from Ramy Youssef, Jerrod Carmichael and A24*

*Hulu and Blumhouse Television Unveil Year-Round Horror Event Series:* Into the Dark

*Emmy and Golden Globe Award-Winning Series,* The Handmaid's Tale,

Renewed *for Season Three*

*#1 New Broadcast Drama,* The Good Doctor, *to Stream Exclusively on Hulu in New Deal with Sony*

*Pictures Television*

*Company Announces Its First-ever Agreement with DreamWorks Animation in Hulu's Largest Kids*

*and Family Licensing Deal to Date*

*Hulu to Launch Ad-Supported Downloadable Content During 2018-19 Upfront Season*

MAY 2, 2018 [NEW YORK, NY] Today, during the Hulu 18 Presentation at the newly-named Hulu Theater at Madison Square Garden, executives took the stage to reveal the company's rapid growth, announce multiple original programming and exclusive acquisition deals that expand Hulu's content offering, and unveil new product and measurement innovations that will bring the future of television to the advertising business.

Reinforcing Hulu's position as one of the world's top 10 direct-to-consumer entertainment brands, the company announced that it has surpassed 20 million U.S. subscribers and has grown total engagement on Hulu by more than 60%. In addition, Hulu revealed that 78% of viewing on the service takes place in the living room, on connected TVs.

"Hulu is the complete TV experience for consumers, offering both live and on-demand programming and more consumer choice than ever before," said Freer. "We are the only place that delivers award-winning content, ad loads less than half that of traditional television, with ads that are always viewable and always in a brand-safe environment — and we are leading the TV and advertising industries into the future."

Announcements at this year's presentation include:

New Series *Four Weddings and a Funeral* and *Ramy* Join *Catch-22*, *The First*, *Castle Rock* and *Little Fires Everywhere* as Hulu Originals

Hulu has expanded its slate of critically-acclaimed original series with new series orders for *Four Weddings and a Funeral* and *Ramy*, which join upcoming Hulu Originals *Castle Rock,* Hulu's second project from J.J. Abrams and Stephen King set to premiere on July 25; *Catch-22*, from George Clooney and starring Kyle Chandler; *The First*, from Beau Willimon and starring Sean Penn; and *Little Fires Everywhere*, from Reese Witherspoon and Kerry Washington, based on the acclaimed novel of the same name.

Today, the company confirmed an order for *Four Weddings and a Funeral,* a limited series written and executive produced by Mindy Kaling and Matt Warburton, inspired by the 1994 British romantic comedy film. The series will follow a group of friends as their lives intersect through five events. Kaling and Warburton – who teamed up together for The Mindy Project – will executive produce alongside Jonathan Prince, Howard Klein (3 Arts), Tim Bevan and Eric Fellner (Working Title).

The series comes to Hulu from MGM Television and Universal Television, with MGM serving as the lead studio, and marks Mindy Kaling's second original series with Hulu following *The Mindy Project*. The project marks the second project with MGM Television following *The Handmaid's Tale* and its third project with Universal Television following *The Path* and *The Mindy Project.*

Hulu has also given a series order to *Ramy*, a groundbreaking comedy series based on the real-life experiences and comedy of Ramy Youssef. The series takes viewers into the world of Ramy, a first generation American Muslim who is on a spiritual journey in his politically-divided New Jersey neighborhood. *Ramy* will bring a new perspective to the screen as it explores the challenges of what

HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER – Hulu Press Site

Case 3:22-cv-02071-L   Document 1-6   Filed 09/16/22   Page 46 of 67   PageID 88

it's like being caught in-between an Egyptian community that thinks life is moral a test, and a millennial generation that thinks life has no consequences.

*Ramy* is written, executive produced, created by and starring Ramy Youssef, and executive produced by Jerrod Carmichael, co-creators Ari Katcher and Ryan Welch as well as A24's Ravi Nandan. The series marks the first original series order for Hulu from A24, an award winning New York-based media company focused on the distribution, financing, development and production of television and feature film projects.

Hulu and Blumhouse Television Reveal *Into The Dark* Year-Round Horror Event Series

In partnership with Blumhouse Television, Hulu unveiled *Into The Dark*, a brand new horror event series from prolific, award-winning producer, Jason Blum's independent TV studio. The series will include 12 standalone super-sized episodes, with a new installment released on the first Friday of every month throughout the year. Each episode is inspired by a holiday from the month of it release, but all will feature Blumhouse's signature genre/thriller spin on the story. Blumhouse Television, drawing on its deep talent relationships, is working with a broad section of filmmakers, creators and actors to bring this unique, first-of-its-kind series to Hulu audiences.

The first story, *The Body*, premieres on Friday, October 5. Set in the selfie culture of Los Angeles on Halloween night, *The Body* follows a sophisticated, overconfident hitman who always carries out his work in style. He decides to take things even further one day by transporting his latest victim in plain sight, correctly assuming that self-absorbed LA partiers will simply be enamored with his elaborate

HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER – Hulu Press Site

Case 3:22-cv-02071-L   Document 1-6   Filed 09/16/22   Page 47 of 67   PageID 89

"costume." studying his wisdom of opportunity, this one of the best horrors to show Wilkes' true colors reveal themselves to some groupies that have latched on to him. It becomes a battle of will and wits.

Based on a short film of the same name, *The Body* will be directed by Paul Davis and will star Tom Bateman (*Murder on the Orient Express*, *Vanity Fair*) as Wilkes, the suave, professional hitman, and Rebecca Rittenhouse (*The Mindy Project*, *Blood & Oil*) as Maggie, a feisty, whip-smart, woman who becomes captivated by Wilkes the more she learns of his real profession. Aurora Perrineau (Blumhouse's *Truth or Dare*) plays Dorothy, who uses her cynicism and resourcefulness to try to outwit Wilkes. She is joined by David Hull (*Crazy Ex-Girlfriend*, *Insecure*) as Allan, and Ray Santiago (*Ash vs Evil Dead*, *Meet the Fockers*, *In Time*) as Jack — both are Hollywood and Internet wannabes whose cluelessness complicates the evening time and again. The script was co-written by Paul Fisher, who will also serve as a producer on the project, and Davis. Alexa Faigen (*Safe House*, *Love Happens*) is executive producing for Blumhouse.

*Into the Dark*'s second installment, to be released on Friday, November 2, will be *Flesh & Blood*, directed by Patrick Lussier (*My Bloody Valentine*, *Dracula 2000*). Dermot Mulroney (*August: Osage County*, *Shameless*, *The Wedding Date*) stars as Henry, a doting father trying to help his daughter, Kimberly, a teenager suffering from agoraphobia, who has not left the house since her mother's still-unsolved murder. Kimberly is played by newcomer Diana Silvers, and Tembi Locke (*Dumb and Dumber To*, *Eureka*) plays her therapist. Set on the eve of Thanksgiving a year after her mother's death, Kimberly begins to suspect that she is in danger in the home, but she can't leave and doesn't know who she can trust.

HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER – Hulu Press Site

Case 3:22-cv-02071-L    Document 1-6    Filed 09/16/22    Page 48 of 67    PageID 90

*The Handmaid's Tale* Renewed for Season Three

Following its record-breaking season two premiere last week — which has already doubled its audience versus season one — Hulu has renewed the Emmy and Golden Globe Award-winning series *The Handmaid's Tale* for a third season.

Since its premiere in April 2017, *The Handmaid's Tale* has gone on to become the first series ever on a streaming video on-demand service to take both the Golden Globe and Emmy Award for Best Drama Series. *The Handmaid's Tale* is an eight-time Emmy Award-winning drama series and has garnered more than 30 prestigious awards to date, including a 2018 Peabody Award.

Based on the award-winning, best-selling novel of the same name by Margaret Atwood, *The Handmaid's Tale* became the most-viewed series debut on Hulu ever in its first week and has drawn acclaim from both fans and critics since its series premiere. Starring Elisabeth Moss, Joseph Fiennes, Yvonne Strahovski, Alexis Bledel, Madeline Brewer, Ann Dowd, O-T Fagbenle, Max Minghella, Samira Wiley, and Amanda Brugel, the series is created for television by Bruce Miller, who serves as the series' showrunner. *The Handmaid's Tale* is executive produced by Miller, Warren Littlefield, Daniel Wilson, Fran Sears, Ilene Chaiken and Elisabeth Moss. Margaret Atwood serves as a co-executive producer for season three of the series.

Hulu Continues Adding the Best of TV With Exclusive SVOD Deal For Broadcast's No. 1 New

HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER – Hulu Press Site

Case 3:22-cv-02071-L    Document 1-6    Filed 09/16/22    Page 49 of 67    PageID 91

Under a new agreement with Sony Pictures Television, Hulu is now the exclusive SVOD streaming home to ABC's hit drama series *The Good Doctor*. The complete first season of the series is now available on Hulu, and future episodes will become available the day after their original broadcast on ABC. Following last year's acquisition of NBC's *This Is Us*, this marks the second consecutive year Hulu has secured exclusive SVOD rights to broadcast's #1 new drama.

*The Good Doctor* – which just wrapped up its first season – was recently renewed for a second season following a breakout premiere. The series has become ABC's most watched freshman series in 13 years and delivered triple-digit year-over-year time period increases to Monday's 10 o'clock hour for ABC in Total Viewers (+172%) and Adults 18-49 (+162%).

The series stars Freddie Highmore, Antonia Thomas, Nicholas Gonzalez, Chuku Modu, Beau Garrett, Hill Harper, Richard Schiff and Tamlyn Tomita. The series is from Sony Pictures Television and ABC Studios. David Shore is writer and executive producer. Daniel Dae Kim, David Kim, Seth Gordon and Sebastian Lee are also executive producers.

*The Good Doctor* joins a growing list of hit ABC series now streaming exclusively on Hulu in SVOD, including Sony Pictures Television's *The Goldbergs.*

Hulu Strikes Its Largest Kids & Family Licensing Deal to Date in First-Ever Agreement with

Hulu today announced its first-ever multi-year deal with DreamWorks Animation, making Hulu the exclusive streaming home to future slates of DreamWorks Animation feature films, as well as iconic DreamWorks library films. In addition, Hulu will work with DreamWorks Animation Television to develop original kids & family series for exclusive streaming based on the company's popular franchises and upcoming feature films. This marks the first time Hulu has partnered with a major studio in a multi-series commitment to debut original kids & family content.

Through the deal, Hulu will become the exclusive U.S. streaming home to future theatrical releases from the studio beginning in 2019, including upcoming franchise films *How to Train Your Dragon: The Hidden World*, *The Boss Baby 2* and *Trolls 2*, in the pay one window. It will also expand Hulu's film offering in the coming years with a catalog of popular library films from the studio including *Shrek*, *Shrek 2* and *Shark Tale*, the first time DreamWorks Animation titles will become available to stream on Hulu.

As part of Hulu's commitment to expanding its library with family programming, the deal also makes Hulu the home to a slate of new, original series inspired by characters from DreamWorks' hit franchises and upcoming feature films.  DreamWorks Animation Television will develop and produce the series, which will debut on Hulu beginning in 2020.

Hulu To Introduce Advertising in Live TV

Case 3:22-cv-02071-L   Document 1-6   Filed 09/16/22   Page 51 of 67   PageID 93

Beginning later this quarter, Hulu will begin offering dynamically inserted advertising within its Hulu With Live TV product. This will allow brands to reach Hulu's young and engaged audience in its live sports, news and entertainment programming. This capability will be introduced across select cable networks and roll out onto additional live content over the coming months.

Hulu to Launch the Industry's First Ad-Supported Downloadable Content Experience

Today, Hulu announced its plans to become the first company to offer a downloadable content experience with opportunities for advertisers. The new feature will make it possible for subscribers to access their favorite shows and movies on the go, with no internet connection required, and will give advertisers the opportunity to reach their target audiences in a viewing experience never before available to advertisers.

"Our launch of the industry's first ad-supported downloadable content experience is yet another example of how Hulu is innovating viewer-first ad solutions to drive powerful results for brands" said Peter Naylor, SVP of Advertising Sales at Hulu. "With downloadable content, we're offering brands more ways to connect with engaged viewers who love the experience of watching television, wherever they may be."

The experience will launch on Hulu during the 2018-19 upfront season.

Hulu Establishes Digital Ad Ratings as the New Currency for Advertisers

HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER – Hulu Press Site

Case 3:22-cv-02071-L   Document 1-6   Filed 09/16/22   Page 52 of 67   PageID 94

Today, Hulu revealed that Nielsen Digital Ad Ratings (DAR) for OTT is now its currency of business across the platform.  Advertisers can use DAR to measure, guarantee and report campaign audience delivery across all desktop, mobile and connected devices, providing vital insight into viewership on the platform. With 78% of Hulu viewing taking place in the living room, DAR provides accurate, holistic measurement for everyone watching.

Hulu Doubles Down on Driving Business Outcomes, Expands Suite of Sales Effectiveness Tools

As part of Hulu's efforts to offer advertisers more ways to prove business outcomes, Hulu announced it has expanded its suite of sales effectiveness tools with four new partnerships.

Hulu will now offer attribution across the auto and retail categories working with IHS Markit for Polk Campaign Measurement Solutions and Nielsen Buyer Insights, respectively. In addition, Hulu announced an expanded offering for CPG brands with the help of IRI's attribution solution.

And in partnership with Experian, Hulu will offer advertisers the ability to enhance their CRM data with Hulu's first-party data to deliver better insight into sales growth on the platform.

About Hulu

Hulu is a leading premium streaming service that offers instant access to live and on demand

channels, original series and films, and a premium library of TV and movies to more than 20 million subscribers in the U.S. Since its launch in 2008, Hulu has consistently been at the forefront of entertainment and technology. Hulu is the only streaming service that offers both ad-supported and commercial-free current season shows from the largest U.S. broadcast networks; libraries of hit TV series and films; and acclaimed Hulu Originals including Emmy® and Golden Globe Award-winning series *The Handmaid's Tale, The Looming Tower, Future Man, Marvel's Runaways, The Path, 11.22.63*, and Golden Globe nominated comedy Casual, as well as upcoming series *Castle Rock, The First, Catch-22* and *Little Fires Everywhere*. In 2017, Hulu added live news, entertainment and sports from 21st Century Fox, The Walt Disney Company, NBCUniversal, CBS Corporation, The CW, Turner Networks, A+E Networks and Scripps Networks Interactive to its offerings – making it the only TV service that brings together live, on-demand, originals, and library content all in one place, across living room and mobile devices.

HULU SURGES PAST 20 MILLION U.S. SUBSCRIBERS AND ANNOUNCES PLANS TO OFFER ADVERTISING IN LIVE TV THIS QUARTER – Hulu Press Site

Case 3:22-cv-02071-L    Document 1-6    Filed 09/16/22    Page 54 of 67    PageID 96

# LATEST PRESS RELEASES

July 16, 2018

## IT'S OFFICIAL: UnREAL MOVES TO HULU FOR ITS FINAL SEASON

ACQUISITIONS, CONTENT, ORIGINALS

July 12, 2018

## HULU LANDS RECORD 27 PRIMETIME EMMY® AWARD NOMINATIONS

ACQUISITIONS, BUSINESS, CONTENT, MOVIES, ORIGINALS

Follow @Hulu

  

**HULU**

About Us

Executives

Subscribe Now

**ADVERTISING**

Ad Experience

Brand Solutions

Hulu Originals

Case 3:22-cv-02071-L    Document 1-6    Filed 09/16/22    Page 55 of 67    PageID 97

JOBS

Positions

Hulugan Life

What Defines Hulu

Employee Verification

FOLLOW US

Twitter

Facebook

Tumblr

YouTube

Instagram

Google+

PRESS

Originals

News

Schedule

Press Site Terms

LEGAL

Description Of Methodology (DOM)

About Ads

Hulu.com Terms

Privacy Policy

© 2017 Hulu

# Exhibit C

APRIL 8, 2020

# Disney+ Paid Subscriber Count Surpasses 50 Million Milestone



## LAUNCHED FIVE MONTHS AGO, THE SERVICE IS NOW AVAILABLE IN MORE THAN A DOZEN COUNTRIES AROUND THE WORLD

BURBANK, CA (April 8, 2020) – Continuing to delight consumers around the world, Disney+ has now achieved another new milestone, with 50 million paid subscribers globally within five months after its U.S. launch.

"We're truly humbled that Disney+ is resonating with millions around the globe, and believe this bodes well for our continued expansion throughout Western Europe and into Japan and all of Latin America later this year," said Kevin Mayer, Chairman of Walt Disney Direct-to-Consumer & International. "Great storytelling inspires and uplifts, and we are in the fortunate position of being able to deliver a vast array of great entertainment rooted in joy and optimism on Disney+."

In the past two weeks, Disney+ rolled out in eight Western European countries including the UK, Ireland, France, Germany, Italy, Spain, Austria, and Switzerland. Additionally, Disney+ became available last

week in India, where it is offered in conjunction with the existing Hotstar service, and already accounts for approximately eight million of Disney+'s 50 million paid subscribers.

ABOUT DISNEY+

Disney+ is the dedicated streaming home for movies and shows from Disney, Pixar, Marvel, Star Wars, National Geographic, and more. As part of Disney's Direct-to-Consumer and International (DTCI) segment, Disney+ is available on most internet-connected devices and offers commercial-free programming with a variety of original feature-length films, documentaries, live-action and animated series and short-form content. Alongside unprecedented access to Disney's incredible library of film and television entertainment, the service is also the exclusive streaming home for the latest releases from The Walt Disney Studios. Visit DisneyPlus.com to subscribe and/or learn more about the service.

Forward-Looking Statements

Certain statements and information in this communication may be deemed to be "forward-looking statements" within the meaning of the Federal Private Securities Litigation Reform Act of 1995, including statements such as the expected performance of our goods and services, anticipated availability or timing of our goods or services and other statements that are not statements of historical fact. These statements are often characterized by terminology such as "will," "believe" and similar expressions. These statements are made based on views and assumptions as of the time made and the Company does not undertake any obligation to update these

statements.

Actual results may differ materially from those expressed or implied. Such differences may result from actions taken by the Company, including strategic or restructuring initiatives (including capital investments, asset acquisitions or dispositions) or other business decisions (including regarding direct-to-consumer launch timing, platform or content), as well as from developments beyond the Company's control, including:

- changes in domestic and global economic conditions, competitive conditions and consumer preferences;
- adverse weather conditions or natural disasters;
- health concerns;
- international, regulatory, political, or military developments (including government requests to delay direct-to-consumer launch in certain jurisdictions);
- technological developments; and
- labor markets and activities;

each such risk includes the impacts of COVID-19 and related mitigation efforts.

Such developments may further affect entertainment, travel and leisure businesses generally and may, among other things, further affect:

- the performance of the Company's theatrical and home entertainment releases;
- the advertising market for broadcast and cable television

- programming;
- demand for our products and services;
- construction;
- expenses of providing medical and pension benefits;
- income tax expense;
- performance of some or all company businesses either directly or through their impact on those who distribute our products; and
- achievement of anticipated benefits of the TFCF transaction.

Additional factors are set forth in the Company's Annual Report on Form 10-K for the year ended September 28, 2019 under Item 1A, "Risk Factors," Item 7, "Management's Discussion and Analysis" under Item 1A, "Risk Factors," Item 7, "Management's Discussion and Analysis," Item 1, "Business," and subsequent reports, including, among others, Quarterly Reports on Form 10-Q and Current Reports on Forms 8-K.

Media Contacts:

Zenia Mucha
818-560-5300
Zenia.Mucha@disney.com

Karen Hobson
818-560-4057
Karen.Hobson@disney.com

READ MORE ABOUT

PRESS RELEASES

FOLLOW US ON



Terms of Use | Privacy Policy | Your California Privacy Rights | Children's Online Privacy Policy |
Disney.com Guest Services | Advertise With Us | Interest-Based Ads | Do Not Sell My Personal Information | Contact Us

© Disney. All rights reserved

# Exhibit D

Case 3:22-cv-02071-L   Document 1-6   Filed 09/16/22   Page 63 of 67   PageID 105

**NETFLIX**

(https://www.netflix.com/)
Help Center (/en)

Member Sign In
(https://www.netflix.com/Login?
locale=en&nextpage=https%3A%2F%
2Fhelp.netflix.com%2Fen%2Fnode%
2F412)

> How does Netflix work?

Start Your Free Month

(https://www.netflix.com/getStarted)

## How does Netflix work?



## What is Netflix?

Netflix is a streaming service that allows our customers to watch a wide variety of award-winning TV shows, movies, documentaries, and more (https://media.netflix.com/) on thousands of internet-connected devices (http://devices.netflix.com/). With Netflix, you can enjoy unlimited viewing of our content without having to watch a single commercial. There's always something new to discover, and more TV shows and movies are added every month!

---



## Free Trial

Try us free (https://netflix.com/getstarted) for 1 month!* If you enjoy your Netflix trial, do nothing and your membership will automatically continue for as long as you choose to remain a member.

Case 3:22-cv-02071-L    Document 1-6    Filed 09/16/22    Page 64 of 67    PageID 106

Netflix membership is a month-to-month subscription that begins on the date you sign up. No contract, no cancellation fees, no commitment. Cancel online anytime (https://help.netflix.com/en/node/407), 24 hours a day.

*Free trial availability varies by region.



# Membership

Pick your price, pick your plan! Netflix offers 3 membership plans (https://www.netflix.com/getstarted/) to suit your needs. Your plan will determine how many people can stream Netflix content at once, and whether you can view in Standard Definition (SD), High Definition (HD), or Ultra High Definition (UHD).

- **Basic Plan**: 1 screen plan SD (watch on 1 screen at a time, Standard Definition)

- **Standard Plan**: 2 screen plan HD (watch on 2 screens at the same time, High Definition when available)

- **Premium Plan**: 4 screen plan HD/UHD 4K (watch on 4 screens at the same time, includes High Definition and Ultra High Definition when available)

- **DVD Plan (only available in the US)**: US customers can sign up for a DVD-only plan (http://dvd.netflix.com/), or add DVDs (https://help.netflix.com/en/node/22) to their current streaming plan.

The first month is free for new members. If you choose to remain a member of Netflix, you'll be billed once a month on the date that you originally signed up. For more info, learn how Netflix charges your account (https://help.netflix.com/en/node/27).

You can change or upgrade your plan (https://help.netflix.com/en/node/22) anytime from your Account (https://www.netflix.com/YourAccount) page.

Case 3:22-cv-02071-L    Document 1-6    Filed 09/16/22    Page 65 of 67    PageID 107



# TV Shows & Movies

In over 190 countries (https://help.netflix.com/en/node/14164), Netflix members get instant access to great content. Netflix has an extensive global content library featuring award-winning Netflix originals, feature films, documentaries, TV shows, and more (https://media.netflix.com/). Netflix content will vary by region, and may change over time.

The more you watch, the better Netflix gets at recommending TV shows and movies you'll love.

You can play, pause, and resume watching, all without commercials or commitments.

Plus, you can download your favorite shows (https://help.netflix.com/en/node/54816) to your iOS or Android mobile device, or Windows 10 app. With downloads, you can watch while you're on the go and without an internet connection. Go ahead, binge a little!

Case 3:22-cv-02071-L    Document 1-6    Filed 09/16/22    Page 66 of 67    PageID 108



# Streaming Devices

Watch anywhere, anytime, on thousands of devices. Netflix streaming software allows you to instantly watch content from Netflix through any internet-connected device (https://devices.netflix.com/) that offers the Netflix app, including smart TVs, game consoles, streaming media players, smartphones, and tablets. View our Internet Speed Recommendations (https://help.netflix.com/en/node/306) to achieve the best performance. You can also stream Netflix directly from your computer or laptop. We recommend reviewing the System Requirements (https://help.netflix.com/en/node/23742) for web browser compatibility.

The Netflix app may come pre-loaded on certain devices, or users may need to download the Netflix app onto their device. Netflix app functionality may differ between devices. See our Terms of Use for limitations and usage.

Need help getting set up? Search our Help Center (https://help.netflix.com/) for the manufacturer of the device you're using.

---



# Get Started!

Follow these easy steps to start watching Netflix today:

1. Choose the membership plan (https://www.netflix.com/getstarted/) that's right for you.

2. Create an account by entering your email address and creating a password.

Case 3:22-cv-02071-L    Document 1-6    Filed 09/16/22    Page 67 of 67    PageID 109

3. Enter a payment method so you don't miss a single episode when your free trial ends.

4. That's it. Stream on!

You can cancel your free trial at any time during your first 30 days and never be charged. If you choose not to cancel, your account will not be charged until your free trial ends. We'll send you a reminder email three days before your free trial ends to ensure you're still enjoying Netflix.

As a member of Netflix, you'll be billed once a month (https://help.netflix.com/en/node/27) on the date you originally signed up. If you decide Netflix isn't for you, you always have the option to cancel online (https://help.netflix.com/en/node/407), anytime.

Back to Home (https://help.netflix.com/)



Was this article helpful?

YES          NO

 Call Us

 English

Terms of Use (/legal/termsofuse)        Privacy (/legal/privacy)        Cookie Preferences (/legal/privacy#cookies)
Corporate Information (/support/2101)